209 F.3d 125 (2nd Cir. 2000)
 In Re: MANVILLE FOREST PRODUCTS CORPORATION, Debtor.
OLIN CORPORATION, Appellant,
v.
RIVERWOOD INTERNATIONAL CORPORATION, formerly known as Manville Forest Products Corporation, Appellee.
 No. 682, Docket No. 99-5047
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: November 5, 1999
Decided: April 07, 2000
 
 1
 Appeal from a judgment of the United States District Court for the Southern District of New York (Stein, J.) affirming an order of the United States Bankruptcy Court for the Southern District of New York (Lifland, B.J.), granting plaintiff-appellee's motion for partial summary judgment and denying defendant-appellant's motion for summary judgment.
 
 
 2
 Affirmed.
 
 
 3
 MICHAEL H. WETMORE, Husch & Eppenberger, LLC, St. Louis, MO (Philip Bentley, Kramer, Levin, Naftalis & Frankel, LLP, New York, NY, on the brief), for Defendant-Appellant.
 
 
 4
 KAREN E. WAGNER, Davis Polk & Wardwell, New York, NY (Lowell Gordon Harriss, Rebecca Winters, on the brief), for Plaintiff-Appellee.
 
 
 5
 Before: JACOBS, STRAUB, Circuit Judges, and PAULEY, District Judge.*
 
 PAULEY, District Judge:
 
 6
 Olin Corporation ("Olin") appeals an order and judgment of the United States District Court for the Southern District of New York (Stein, J.), affirming the order and judgment of the United States Bankruptcy Court for the Southern District of New York (Lifland, B.J.), 225 B.R. 862 (Bankr. S.D.N.Y. 1998). The bankruptcy court granted summary judgment in favor of Riverwood International Corporation ("Riverwood") on Olin's claim for indemnification, holding that the indemnification claim was discharged and barred by a prior bankruptcy confirmation order. The bankruptcy court denied Olin's motion for summary judgment on the same grounds. For the reasons set forth below, we affirm.
 
 BACKGROUND
 
 7
 In January 1967, Olin transferred its forest products division to Olinkraft, Inc. ("Olinkraft"), a wholly-owned subsidiary of Olin. Olin transferred to Olinkraft a piece of real property in Louisiana on which Plant 94, a plant operated by Olin's forest products division, was located. At the time of the transfer, Olinkraft executed and delivered to Olin an indemnification agreement, which stated in relevant part:
 
 
 8
 Olinkraft hereby assumes and agrees to pay, perform and discharge, and to save Olin harmless with respect to, and at Olinkraft's expense to defend any actions brought in connection with, all debts, obligations, contracts and liabilities of Olin with respect to such Division of every kind, character or description, whether accrued, absolute, contingent or otherwise (and whether or not reflected or reserved against on Olin's balance sheets, books of account and records or arising after the date hereof) including, without limiting the foregoing general language, all of the covenants and undertakings of Olin contained in or pursuant to commitments, sales orders, purchase orders, notes, agreements, promises and undertakings of every kind, written or oral, with respect to such Division.
 
 
 9
 In May 1974, Olinkraft became an independent public company. At that time, Olinkraft reaffirmed the undertakings contained in the 1967 indemnification agreement and executed a second indemnification agreement, where Olinkraft agreed:
 
 
 10
 to indemnify and save Olin, its successors and assigns, harmless with respect to, and at Olinkraft's expense to defend any action brought against Olin, its successors and assigns, in connection with . . . all claims, obligations and liabilities of any kind, including matters now or hereafter in litigation, which may be asserted against or imposed on Olin in respect of Olinkraft, or any of its Subsidiaries, its or their active or former employees, business, operations or assets, whether accrued, absolute, contingent, or otherwise.
 
 
 11
 On January 19, 1979 Olinkraft merged into JM Capital, a wholly-owned subsidiary of Johns-Manville Corporation. Thereafter, Olinkraft changed its name to Manville Forest Products Corporation ("Manville").
 
 
 12
 In 1982, Manville filed for relief under Chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the Southern District of New York. The bankruptcy court set a deadline of December 29, 1983 for Manville's debtors to file proofs of pre-petition claims. On December 28, 1983, Olin filed a claim for certain taxes owed to it by Manville. Olin did not file proofs for any claims under the indemnification agreements.
 
 
 13
 On March 26, 1984, the bankruptcy court entered an order confirming Manville's reorganization plan. The order provided that Manville was discharged from any and all unsecured debts that arose prior to the confirmation of the plan, whether or not proof of the claim was filed. Subsequent to the bankruptcy proceedings, Manville changed its name to Riverwood International Corporation ("Riverwood").
 
 
 14
 On July 13, 1984, the state of Louisiana enacted the Louisiana Environmental Quality Act ("LEQA"), La. Rev. Stat. Ann. 30: 2271, et seq. (West 1984). LEQA is a comprehensive environmental remediation plan and provides for liability for environmental clean-up costs by current and former owners of polluted property. On May 20, 1996, the Louisiana Department of Environmental Quality, relying upon LEQA, sent demand letters to Olin and Riverwood for remediation of the Plant 94 site. On June 28, 1996, Olin sent a letter to Riverwood requesting indemnification for any losses or liabilities arising out of the Plant 94 site remediation.
 
 
 15
 Riverwood filed this action on April 15, 1998 in the bankruptcy court. Riverwood moved for partial summary judgment seeking an order determining that any claims arising under the indemnification agreements were discharged by the confirmation order. Riverwood contended that Olin's indemnification rights arose upon the execution of the indemnification agreements and were pre-petition claims discharged by the bankruptcy confirmation.
 
 
 16
 Olin also filed a motion for summary judgment seeking a determination that its indemnification rights were not barred by the confirmation order. Olin claimed that because LEQA was not enacted until after the confirmation proceeding was complete, the demand for indemnification did not constitute a "claim" under the Bankruptcy Code prior to the statute's enactment, and therefore, was not discharged by the earlier confirmation proceeding. Olin argued that the bankruptcy court should rely upon cases where the claim arose directly under a statute and not from a pre-petition contract.
 
 
 17
 The bankruptcy court determined that the central issue in the case was whether Olin's indemnification rights under the agreements constituted pre-petition claims. The bankruptcy court granted Riverwood's motion for summary judgment and denied Olin's motion for summary judgment, holding that any indemnification rights owed to Olin under the 1967 and 1974 agreements were contingent claims discharged by the confirmation order. The bankruptcy court rejected Olin's argument that its indemnification claims should be treated as arising directly under LEQA and decided instead that the claims arose under contract. In determining that Olin's indemnification claims had arisen pre-petition, the bankruptcy court noted that the legal relationship between Olin and Riverwood was created when the indemnification agreements were executed, and those agreements contained all of the necessary elements to give rise to a right of payment at that time. The court also observed that a contingent claim arises upon the execution of a contract when the occurrence of the contingent event triggering indemnification was contemplated by the parties at or before execution. The bankruptcy court determined that the broad language of the indemnification agreements indicated that future environmental cleanup liability was contemplated by the parties.
 
 
 18
 Olin appealed the bankruptcy court's decision. In an order dated April 23, 1999, the district court affirmed the opinion of the bankruptcy court, adopting the rationale of the bankruptcy court. On May 20, 1999, Olin filed a timely appeal of the district court's decision.
 
 DISCUSSION
 
 19
 Our review of the district court's decision is plenary. See United States Lines (S.A.), Inc. v. United States (In re McLean Indus. Inc.), 30 F.3d 385, 387 (2d Cir. 1994). We must "independently examine the bankruptcy court's decision, applying the clearly erroneous standard to findings of fact and de novo review to conclusions of law." Id., 30 F.3d at 387 (quoting Klein v. Civale & Trocato, Inc. (In re The Lionel Corp.), 29 F.3d 88, 89 (2d Cir. 1994)) (internal quotation marks omitted). Because the facts of the case are not in dispute, we review the decision de novo.
 
 
 20
 The Bankruptcy Code provides that confirmation of a reorganization plan discharges the debtor from any debt that arose before the date of the confirmation, regardless of whether proof of the debt is filed, the claim is disallowed, or the plan is accepted by the holder of the claim. See 11 U.S.C. 1141(d)(1) (1993). A valid pre-petition claim requires two elements. See LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 497 (2d Cir. 1995). First, the claimant must possess a right to payment. Second, that right must have arisen prior to the filing of the bankruptcy petition.[1] Whether a claim exists is determined by bankruptcy law, while the time a claim arises is determined under relevant non-bankruptcy law. See id. Thus, if Olin's indemnification rights were "claims" against Riverwood that existed prior to the filing of Riverwood's bankruptcy petition, then those claims were discharged and are now barred. Conversely, if Olin's indemnification rights were not pre-petition claims, then those claims were not discharged and now may be considered.
 
 
 21
 In order for Olin's indemnification rights to have been discharged by the bankruptcy confirmation, they must constitute claims under the Bankruptcy Code. When Riverwood filed for bankruptcy, a "claim" was defined, pursuant to the Bankruptcy Reform Act of 1978, as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. 101(5)(A). This definition of "claim" replaced the far narrower concept of claim allowance established in the Bankruptcy Act of 1898, which only allowed for participation by claimants with a provable claim. See 11 U.S.C. 103(a). Consequently, under the Bankruptcy Act of 1898, contingent or unliquidated claims incapable of reasonable or prompt valuation were disallowed entirely as unprovable but survived the discharge. See 11 U.S.C. 63. Congress realized the provability requirement ill-served the policies underlying bankruptcy and broadened the definition of "claim" in the Bankruptcy Reform Act of 1978. See In re Johns-Manville Corp., 57 B.R. 680, 686-87 (Bankr. S.D.N.Y. 1986); see also United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997, 1003 (2d Cir. 1991) (Congress gave the term claim a broad definition and "contemplate[d] that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case") (quoting H.R. Rep. No. 95-595, at 309 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6266) (internal quotation marks omitted).
 
 
 22
 Under the current code, even contingent and unliquidated debts can constitute claims. See 11 U.S.C. 101(5)(A), 1141(d)(1). The Bankruptcy Code does not specifically define "contingent" claims. However, in the context of a contract claim, such as the case here, we have said that contingent claims refer "to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." LTV Corp. (In re Chateaugay Corp.), 944 F.2d at 1004 (internal quotation marks omitted).
 
 
 23
 Even if Olin's indemnification rights constitute rights to payment under the Bankruptcy Code, those rights will be considered discharged only if they arose before the filing of the petition. See LTV Steel Co. (In re Chateaugay Corp.), 53 F.3d at 497. A claim will be deemed to have arisen pre-petition if "the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation--'a right to payment'--under the relevant non-bankruptcy law." Id., 53 F.3d at 497 (quoting In re National Gypsum Co., 139 B.R. 397, 405 (N.D. Tex. 1992)) (internal quotation marks omitted). Under contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed. See Houbigant, Inc. v. ABC Mercantile, Inc. (In re Houbigant, Inc.), 188 B.R. 347, 358-59 (Bankr. S.D.N.Y. 1995) ("[A] contractual indemnification claim exists as a contingent claim against the indemnitor as of the date the indemnification agreement is executed."); see also Woburn Assocs. v. Kahn (In re Hemmingway Transport, Inc.), 954 F.2d 1, 9 n.9 (1st Cir. 1992) ("When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement.") (quoting Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.), 744 F.2d 332, 336 (3d Cir. 1984)) (emphasis in original) (internal quotation marks omitted).
 
 
 24
 We agree with the bankruptcy and district courts that Olin possessed a valid contingent claim at the time that Riverwood filed for bankruptcy. We find that environmental clean-up liability was contemplated by the parties upon the signing of the indemnity agreements for two reasons. First, Olin operated the Plant 94 site for wood preserving operations immediately prior to the execution of the first indemnification agreement. These wood preserving activities produced the hazardous substances for which the Louisiana Department of Environmental Quality now seeks clean-up under LEQA.
 
 
 25
 Second, the terms of the indemnification agreements were so broad as to encompass all types of future liability, signaling that the parties actually or presumedly contemplated possible environmental liability and liability arising from statutes enacted in the future. A "claim" may exist even where, as in this case, the parties lack complete knowledge about the scope of its potential liability. See LTV Corp. (In re Chateaugay Corp.), 944 F.2d at 1004-05. Thus, the fact that Olin did not know the specific parameters of its liability does not place that liability outside of the definition of "claim" but rather is precisely what made the claim contingent. Under this specific combination of circumstances, we find that future environmental liability was actually or presumedly contemplated by the parties upon their signing of the indemnification agreements and constitutes a valid contingent claim.
 
 
 26
 We also agree with the bankruptcy and district courts that Olin's claims arose pre-petition. Here, the relationship between the parties was created upon the signing of the indemnity agreements in 1967 and 1974. See Houbigant Inc. (In re Houbigant, Inc.), 188 B.R. at 358-59. The indemnity agreements provided that Olinkraft would indemnify Olin upon the happening of a future event giving rise to liability against Olin from its forest products division. The fact that the contingency in this case-the environmental liability claim against Olin-materialized post-petition does not transmogrify the claim into a post-petition claim, but merely means that the contingent claim moved closer to becoming liquidated upon the happening of that contingency. See In re Chateaugay Corp., 102 B.R. 335, 352 (Bankr. S.D.N.Y. 1989). Like the lower courts in this case, we reject Olin's arguments predicated on cases which held that a claim flowing directly from a statute enacted post-petition is not discharged by confirmation even if based upon pre-petition acts. See, e.g., LTV Steel Co. (In re Chateaugay Corp.), 53 F.3d at 497 (holding claim based on Coal Act, which was enacted after the discharge date, was not barred); Chicago, Milwaukee, St. Paul & Pac. R.R. v. Union Pac. R.R., 78 F.3d 285, 288-90 (7th Cir. 1996) (holding claim based on Model Toxics Control Act of the State of Washington, which was enacted after the discharge date, was not barred); In re Reading Co., 115 F.3d 1111, 1122-23 (3d Cir. 1997) (holding claim based on Comprehensive Environmental Response, Compensation, and Liability Act ("CERLCA"), which was enacted after the discharge date, was not barred); In re Penn Central Transp. Co., 944 F.2d 164, 167-68 (3d Cir. 1991) (holding claim based on CERCLA, which was enacted after the discharge date, was not barred). Olin's liability here is triggered by LEQA, but it flows from the indemnification agreements, which allocated risk from a category of anticipated losses without reference or limitation to particular causes of action or particular statutes. In short, Olin brought a contract cause of action based on a pre-petition contract, not a statutory claim for indemnification under a statute enacted under confirmation.
 
 CONCLUSION
 
 27
 For these reasons, the judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable William H. Pauley III, of the United States District Court for the Southern District of New York, sitting by designation.
 
 
 [1]
 We see an inconsistency between the wording of the Bankruptcy Code, which discharges debt arising before the confirmation date, and our statement in LTV Steel Co. (In re Chateaugay Corp.) that the discharged debt must arise before the filing date. However, we need not resolve that point here, because (as discussed below) Olin's claims did in fact arise pre-petition. Chronologically, Olin's claims necessarily arose pre-confirmation as well.